***********
The undersigned have reviewed the prior Opinion and Award based upon the record of the proceedings before Deputy Commissioner Rideout and the briefs and arguments of the parties. The appealing party has not shown good grounds to reconsider the evidence, receive further evidence, or rehear the parties or their representatives. The Full Commission adopts the Opinion and Award of Deputy Commissioner Rideout with minor modifications.
 ***********
The Full Commission finds as fact and concludes as matters of law the following, which were entered into by the parties at the hearing before the deputy commissioner as:
 STIPULATIONS 1. The parties are subject to the N.C. Workers' Compensation Act.
 2. An employee-employer relationship existed between plaintiff and defendant.
 3. The carrier liable on the risk is correctly named.
 4. Plaintiff's average weekly wage is $560.03 per week, resulting in a compensation rate of $373.35.
 5. Plaintiff sustained an injury on or about July 20, 2004, with the exact date to be determined by the Industrial Commission.
 6. Plaintiff's injury arose out of and in the course of employment and is compensable.
 *********** EXHIBITS
The following exhibits are received and admitted for the purposes specified.
1. Stipulated Exhibits: *Page 3 
 a. Hearing Exhibits, to include, but not limited to, North Carolina Industrial Commission Forms, Employment Security Commission items, plaintiff's tax records, and medical records.
 b. Supplemental Hearing Exhibits, to include, but not limited to, medical records, and a stipulation of the parties as to Dr. Martinez' opinion.
2. Plaintiff's Exhibits:.
 a. Medical Records included with the deposition of Dr. McAvoy.
3. Defense Exhibits:
 a. Vocational rehabilitation records included with the deposition of Terry Lee Stacy.
 *********** DEPOSITIONS
The following depositions are received and admitted into evidence:
 1. Deposition of Terry Lee Stacy, taken on May 15, 2006.
 2. Deposition of Dr. Robert L. Allen, taken on May 17, 2006.
 3. Deposition of Dr. Greig V. McAvoy, taken on May 24, 2006.
 4. Deposition of Dr. Lucas J. Martinez, taken on June 5, 2006.
 5. Deposition of Dr. Raymond Baule, taken on April 3, 2008.
 ***********
Based upon all of the competent evidence of record and reasonable inferences flowing therefrom, the Full Commission makes the following: *Page 4 
 FINDINGS OF FACT
1. At the time of the hearing of this matter before the deputy commissioner, plaintiff was a 44 year-old male, who had completed the tenth grade of high school. Plaintiff testified that he had limited reading and mathematical abilities. Plaintiff's vocational history consists of working in the construction industry as a painter and a welder.
2. On July 20, 2004, plaintiff experienced pain in his shoulder while moving a come-along at work. Plaintiff was initially seen at Halifax Regional Medical Center (HRMC) on July 21, 2004 complaining of right shoulder pain that was present for the past three to four months but had worsened when moving a come-along. He also complained of right hand numbness. HRMC records note that plaintiff's shoulder was tender with limited range of motion and that he had no cervical spine tenderness. Plaintiff was diagnosed with a right shoulder strain. He received Darvocet and a splint and was referred to a shoulder specialist. Plaintiff was released to return to work with no restrictions as of July 24, 2004.
3. Plaintiff returned to HRMC on July 26, 2004 and underwent an x-ray of his right shoulder which revealed mild degenerative changes. Plaintiff also had tenderness in his neck. Plaintiff was given a sling and restricted to one-armed work. He was diagnosed with right upper extremity pain and received a prescription for Percocet.
4. On August 23, 2004, plaintiff saw Dr. Greig McAvoy, a board-certified orthopedist at Rocky Mount Orthopedics. Plaintiff reported seeing his family physician, Dr. Byrd, since his injury who had prescribed a Prednisone taper, Naprosyn, Prevacid, and Oxycodone. Dr. McAvoy documented plaintiff's complaints as radiating discomfort in plaintiff's right arm with flexion and extension of plaintiff's neck. The radiating symptoms included a burning feeling in the back of plaintiff's arm and into the radial side of plaintiff's hand and fingers. *Page 5 
On physical examination plaintiff had strength of 5 out of 5 in all groups with no pain with overhead activities, resisted shoulder abduction, or forward elevation. Plaintiff had symmetric reflexes in his biceps and triceps, and his sensation to light touch was intact. Dr. McAvoy diagnosed plaintiff with cervical spondylosis and mild right cervical radiculopathy. He prescribed a second Prednisone Dosepak and Hydrocodone with no refills, and he released plaintiff to return to work with instructions to return as needed.
5. On September 7, 2004, Dr. McAvoy noted plaintiff's continued symptoms but no muscle weakness or atrophy in plaintiff's right upper extremity. He also noted no impingement in plaintiff's shoulder. Dr. McAvoy released plaintiff to return to regular duty work and recommended Tylenol for his pain. He planned to see plaintiff again in six weeks. If plaintiff's symptoms persisted at that time, Dr. McAvoy planned for plaintiff to have an MRI of his cervical spine.
6. On October 19, 2004, plaintiff returned to Dr. McAvoy with complaints of worsened neck pain and radiating symptoms. Dr. McAvoy noted that the distribution was consistent with plaintiff's C6 nerve root compression. He noted no gross atrophy, a good range of motion in plaintiff's joints, and no significant asymmetry in plaintiff's reflexes, though they were equally reduced bilaterally. He recommended an MRI for plaintiff's cervical spine. Dr. McAvoy gave plaintiff restrictions for modified work lifting no more than twenty (20) pounds.
7. On November 1, 2004, plaintiff underwent an MRI of his cervical spine, which revealed a disk bulge and left herniation causing left central canal stenosis at C4-5. The MRI also showed a large right disk herniation with foraminal and lateral recess stenosis at C6-7. Dr. McAvoy reviewed the MRI on November 8, 2004 and interpreted the most significant pathology as the herniation at C6-7, which corresponded with plaintiff's physical findings and complaints. *Page 6 
Dr. McAvoy planned to make a neurosurgical referral for plaintiff and was to contact defendants regarding a preferred provider. Dr. McAvoy continued plaintiff's twenty-pound lifting restrictions.
8. On December 3, 2004, Dr. McAvoy noted that defendants had approved a visit with Dr. Robert Allen, a neurosurgeon in Raleigh. He noted that plaintiff had no significant changes in his symptoms, but reported that plaintiff had trouble riding in a car for the last week and that plaintiff had been unable to work the previous week. He gave plaintiff prescriptions for medications and a cervical CT myelogram. Dr. McAvoy wrote plaintiff out of work completely.
9. On December 6, 2004, defendants accepted plaintiff's injury as compensable on a Form 60. The Form 60 specified that plaintiff became disabled on December 3, 2004 and that his compensation commenced on December 6, 2004.
10. On December 15, 2004, Dr. Allen of Raleigh Neurosurgical Clinic saw plaintiff for complaints of burning and pain in his right arm. Plaintiff described some right-sided posterolateral arm pain radiating into the hand with numbness and tingling in the hand. It was noted that plaintiff had been unable to work since November 28, 2004. On physical examination, plaintiff had significant weakness in his triceps and biceps on the right side when compared to the left. Dr. Allen wrote that a review of the MRI scan showed a large central and right-sided disk herniation at C6-C7. It was noted that plaintiff was miserable with pain and would need urgent surgical treatment. He recommended an anterior diskectomy and fusion due to the significant central component of the disk. Plaintiff was held out of work until a time to be determined in the future.
11. On December 17, 2004, Dr. Allen performed an anterior diskectomy and fusion surgery at C6-7 on plaintiff. *Page 7 
12. On January 11, 2005, Dr. Allen saw plaintiff in follow-up to his diskectomy and fusion. He noted that plaintiff had done well and experienced excellent relief of his arm pain. He started plaintiff on physical therapy. Plaintiff saw Dr. Allen again on February 8, 2005 at which time plaintiff reported having relief from his arm pain but still had neck pain and headaches. Plaintiff was allowed to return to light duty on February 14, 2005 with a thirty (30) pound weight limit until he was seen again in two months. Dr. Allen also prescribed physical therapy.
13. Plaintiff returned to Dr. Allen on April 5, 2005 and reported pain in his first and second fingers and posterior neck spasms. Dr. Allen noted that plaintiff's triceps strength had returned to nearly normal compared to his left and that x-rays showed an excellent fusion hardware and bone graft. He indicated that plaintiff's persistent symptoms were likely from a residual nerve root injury. Plaintiff was to return in two months for a check up and was released to return to work with a thirty (30) pound lifting restriction. Plaintiff was to continue physical therapy.
14. On May 13, 2005, Terry Lee Stacy was assigned as a vocational rehabilitation professional to assist plaintiff with searching for work. On June 7, 2005, Mr. Stacy completed his initial evaluation of plaintiff. He noted that plaintiff had a thirty (30) pound lifting restriction imposed by Dr. Allen on April 5, 2005 and that plaintiff was to return on June 17, 2005 at which time plaintiff would receive additional restrictions. He noted a plan for plaintiff's vocational rehabilitation and began providing vocational rehabilitation services. Mr. Stacy also had plaintiff complete an initial self-assessment in which plaintiff rated his math skills at six (6) out of seven (7). *Page 8 
15. On June 14, 2005, plaintiff returned to Dr. Allen, though his dictated report is mistakenly dated June 27, 2005. On June 14, 2005, Dr. Allen noted that plaintiff had relief of his radicular arm pain, a little residual numbness, and a return of strength in his triceps. Plaintiff's x-rays showed a solid fusion, and Dr. Allen stated that plaintiff was doing well. He noted that plaintiff's residual symptoms should improve, and he recommended that plaintiff continue with vocational rehabilitation to find gainful employment. In a handwritten note from June 14, 2005, Dr. Allen indicated that plaintiff was released to return to work without restrictions. Dr. Allen informally mentioned the release without restrictions in his dictated note, but it was not clearly stated. The parties were unaware of the handwritten note until Dr. Allen's deposition.
16. On August 5, 2005, Mr. Stacy completed a progress report in which he noted that plaintiff was very reluctant to spend time trying to locate suitable employment. Accordingly, Mr. Stacy determined that weekly meetings with plaintiff were warranted.
17. On August 6, 2005, Dr. Allen gave plaintiff a permanent partial impairment rating of fifteen percent (15%). The rating was based on residual numbness in plaintiff's hands. On August 29, 2005, the claims adjuster for defendants by facsimile asked Edna Floyd, an assistant in Dr. Allen's office, to have Dr. Allen address in writing whether plaintiff had any permanent work restrictions as a result of his compensable injury. On September 7, 2005, Kim Lumley, a nurse in Dr. Allen's office, returned the facsimile request with a handwritten note that Dr. Allen gave plaintiff no work restrictions. The undersigned find that the adjuster's communication with Dr. Allen's support staff was a routine communication about work restrictions that imparted no information to Dr. Allen. *Page 9 
18. The undersigned further find that plaintiff signed a written acknowledgement permitting communications with the insurance adjuster for authorization of treatment in workers' compensation matters.
19. On September 5, 2005, Mr. Stacy completed a progress report on plaintiff's vocational rehabilitation efforts. He noted that plaintiff claimed he could not use the North Carolina Employment Security Commission computer system, even with help of ESC personnel. Mr. Stacy stated that plaintiff needed to change his attitude about returning to work.
20. On September 16, 2005, defendants filed a Form 24 Application to Terminate Disability Benefits. The basis of the application was plaintiff's release to return to work without restrictions. Plaintiff responded to defendants' Form 24 on September 30, 2005. On November 2, 2005, the Industrial Commission approved the Form 24 Application permitting defendants to terminate plaintiff's benefits effective September 19, 2005.
21. On September 23, 2005, Mr. Stacy filed a progress report that indicated he had made employer contacts for plaintiff. Mr. Stacy noted that plaintiff still did not pursue open and advertised jobs at the ESC. He reported that had plaintiff done so, a welding job paying $19.00 per hour was open and advertised. Mr. Stacy closed his file on November 3, 2005. He reopened his file at defendants' request on December 6, 2005.
22. On December 14, 2005, Mr. Stacy completed a progress report in which Mr. Stacy arranged a job interview for plaintiff with a company in plaintiff's hometown. The position represented a change from plaintiff's past work experience and initially paid only $300.00 per week. Mr. Stacy noted that the job did not require heavy physical labor and represented a new start in plaintiff's working career. He provided plaintiff with a job application and specific contact information for the potential employer. *Page 10 
23. On January 16, 2006, Mr. Stacy reported that plaintiff had not completed a job application or applied for the job opening he provided to plaintiff one month earlier. On January 25, 2006, Mr. Stacy reported that plaintiff did not follow the instructions Mr. Stacy gave him. He gave plaintiff information about an employer with ten open and advertised job openings paying $10.00-$18.00 per hour in Roanoke Rapids. Mr. Stacy noted that plaintiff needed to change his attitude towards working and make statements to employers that he was willing to work. Mr. Stacy also noted that plaintiff expressed the desire to be placed on disability and to have a final resolution to his claim. Mr. Stacy wrote to plaintiff with information about the positions on January 31, 2006 and February 11, 2006.
24. On February 24, 2006, Mr. Stacy reported that plaintiff's job search efforts were poor and in contradiction to all job search counseling given. He specified that plaintiff did not contact persons with the ability to make hiring decisions, did not point out his skills in employment applications, did not follow up on job applications, and when applying, told potential employers that he was compelled to apply, that he had a workers' compensation injury, and was in pain. Mr. Stacy observed that plaintiff's actions set the plaintiff up for failure and that plaintiff had made the reasons for his efforts known.
25. Pursuant to N.C. Gen. Stat. § 97-27, plaintiff saw Dr. Martinez on March 10, 2006 for a second opinion on his permanent partial impairment rating. Dr. Martinez noted plaintiff's complaints and reviewed plaintiff's November 1, 2004 MRI. Based on this information and a physical examination, he agreed with plaintiff's fifteen percent (15%) permanent partial impairment rating but recommended an additional MRI to rule out progression of plaintiff's disk herniation at C4-5. *Page 11 
26. Plaintiff testified that his symptoms were worsening. He claimed numbness in his right hand had spread to his middle finger and that his arm was getting worse. Plaintiff's unemployment records show he received weekly benefits of $280.00 per week.
27. Dr. Allen testified that after surgery, plaintiff made a sufficient recovery to return to work without restrictions. Dr. Allen testified that he gives work restrictions based on the presence of motor deficits that impact a patient's strength and could cause reinjury. He testified that plaintiff's fusion was solid, all the disk material had been removed, and that a fusion prevented additional neurological problems at the fused level. He further testified that plaintiff's middle finger was innervated by the nerve root at the fused level of plaintiff's cervical spine.
28. Dr. Allen also testified that disk abnormalities, like those plaintiff had at C3-4 and C5-6, are extremely prevalent in people of plaintiff's age. He explained that most people have some abnormal disks in their neck. He stated that such abnormalities are not surgical unless symptomatic. He indicated that plaintiff's asymptomatic disk abnormalities at C3-4 and C5-6 did not require treatment.
29. Dr. McAvoy testified that plaintiff's situation did not necessitate restrictions. He explained that the fusion was solid and stable, so plaintiff would not experience any limitations.
30. Dr. McAvoy testified that he was familiar with Dr. Martinez and respected his technical ability but often disagreed with Dr. Martinez's opinion about return to work issues, work status, and the amount of disability. He explained that he believes returning a patient to preoperative activities benefits the patient. He testified that studies show that returning patients to gainful employment and activities in a timely way is more beneficial than keeping patients out of work for an extended time. He stated that in this regard, he differed from Dr. Martinez. Dr. *Page 12 
McAvoy stated that he would not defer to Dr. Martinez's restrictions even though Dr. Martinez had seen plaintiff more recently.
31. Dr. McAvoy further testified that plaintiff's November 1, 2004 MRI showed a disk bulge and herniation at C3-4; however, he stated that this herniation was on the left of plaintiff's spine and that plaintiff's left side was asymptomatic. He testified that it is impossible to have right-sided complaints from a left sided disk herniation. He testified that for workers' compensation patients, reinjury is much more common due to secondary gain issues with return to work and work dissatisfaction. He also stated that patients with work-related injuries were more likely to complain of problems but actually experience true pathology in less than one percent of cases. He testified that he felt plaintiff needed to return to an active lifestyle with smoking cessation rather than have pain management treatments.
32. Dr. Martinez testified that plaintiff's muscle weakness and other symptoms were potentially consistent with a nerve injury at C4-5. He felt plaintiff would need a twenty (20) to twenty-five (25) pound lifting restriction and possibly another MRI. Dr. Martinez testified that he noted a twenty-five percent (25%) reduction in plaintiff's right tricep strength. He noted questionable weakness of the right deltoid and maybe even some weakness of the biceps. He testified that plaintiff's right side symptoms were most likely caused by compression of plaintiff's C5 nerve root, due to a herniation at C4-5 per plaintiff's November 1, 2004 MRI.
33. Mr. Stacy testified that his entire job search was conducted under the notion that plaintiff had a thirty (30) pound lifting restriction. He indicated that he contacted Dr. Allen's office several times to obtain plaintiff's restrictions but did not get a response. Mr. Stacy noted another position available in plaintiff's hometown. He recalled it was part-time but would move to full-time and provide plaintiff with benefits. Mr. Stacy testified that plaintiff did not keep the *Page 13 
appointment to apply for that job and that he had to reschedule the appointment for plaintiff. He said that, as a job seeker, plaintiff should have followed instructions, which in that case involved talking to the manager. Mr. Stacey testified that plaintiff later talked to the manager but plaintiff told the manager that the insurance man had sent him there, that he was supposed to ask for work, and that he was in pain.
34. Mr. Stacy recalled that plaintiff described himself as having a high mechanical aptitude, and he agreed with plaintiff's assessment of his math abilities. He added that welders must have math skills. Mr. Stacy stated that in his opinion, plaintiff was not interested in doing *Page 13 
those matters necessary to return to work. He said that plaintiff expressly stated that he is not interested in working, part-time or full-time. Mr. Stacy recalled that he identified a job as a TIG pipe welder for which plaintiff was fully qualified. The full-time position was in plaintiff's hometown, met plaintiff's restrictions, and paid $19.00 dollars per hour, more than plaintiff's pre-injury wage.
35. Mr. Stacy said that plaintiff's response to job leads led him to state on January 25, 2006 that plaintiff did not put forth a good effort. He indicated that plaintiff was angry at defendants for not taking him back. He instructed plaintiff that bad-mouthing former employers hinders a job-seeker's chance of employment. Mr. Stacy also explained that plaintiff exhibited self-destructive behavior by making comments to employers that he may get hurt again and by asking the interviewer whether they could give him their name so he could write it down just to prove that he was there.
36. The Full Commission gives greater weight to the opinions of plaintiff's treating physicians, Dr. Allen and Dr. McAvoy. Plaintiff's second-opinion physician Dr. Martinez testified that plaintiff's right upper extremity symptoms were caused by the left-sided disc *Page 14 
herniation at plaintiff's C4-5 disc. Dr. Allen and Dr. McAvoy indicated that plaintiff's C4-5 disc was asymptomatic when they treated plaintiff, and Dr. McAvoy stated that a left sided herniation could not cause right-sided neurological deficits. Furthermore, Dr. Martinez characterized plaintiff's biceps and deltoid weakness as questionable. He later cited weakness at these levels as the basis of his opinion of a C4-5 herniation. For these reasons, the Full Commission gives more weight to the opinions of Dr. Allen and Dr. McAvoy.
37. On August 28, 2006, plaintiff began treating with Dr. Raymond Baule who diagnosed plaintiff with cervical spondylosis and radiculopathy. Dr. Baule recommended an MRI scan which revealed a disc herniation at C4-5, degenerative changes at C5-6, and post surgical changes at C6-7. Based upon the MRI, Dr. Baule recommended additional surgery.
38. On November 15, 2006, Dr. Baule performed a posterior cervical laminectomy with extension of fusion from the previous C6-7 fusion to encompass C4-5 and C5-6. Dr. Baule last saw plaintiff on December 5, 2007. Dr. Baule testified that plaintiff would not need further surgery and that plaintiff was at maximum medical improvement (MMI) as of August 14, 2007.
39. Based upon Dr. Baule's deposition testimony, the Full Commission finds that Dr. Baule was not able to sufficiently relate plaintiff's 2006 surgery to his 2004 workers' compensation injury. Dr. Baule testified that it was unclear what precipitated plaintiff's herniation. Although Dr. Baule initially indicated that the surgery he performed in 2006 was related to plaintiff's 2004 injury, Dr. Baule admitted that his opinion was based on his presumption that plaintiff's disease at C4-5 did not exist at the time of the initial surgery and that his opinion was purely conjecture. *Page 15 
40. The Full Commission finds that plaintiff's medical treatment with Dr. Allen and Dr. McAvoy were related to her compensable 2004 work related injury by accident and were reasonably required to effect a cure, provide relief, or lessen plaintiff's period of disability.
 ***********
Based upon the foregoing stipulations and findings of fact, the Full Commission reaches the following:
 CONCLUSIONS OF LAW
1. Plaintiff sustained an injury by accident arising out of and in the course of employment with the defendant on July 20, 2004. N.C. Gen. Stat. § 97-2 (6).
2. An employee seeking compensation under the Workers' Compensation Act bears "the burden of proving the existence of [her] disability and its extent." Hendrix v Lynn-Corriher Corp., 317 N.C. 179, 185,345 S.E.2d 374, 378, (1986).
3. Disability under the North Carolina Workers' Compensation Act "means incapacity because of injury to earn the wages which the employee was receiving at the time of injury in the same or any other employment." N.C. Gen. Stat. § 97-2(9).
4. In order to support a conclusion of disability, whether temporary or permanent, the Commission must find that plaintiff has shown: (1) incapacity after the injury of earning the same wages earned before injury in the employment, (2) incapacity after the injury of earning the same wages earned before injury in any other employment, and (3) that the incapacity to earn was caused by injury. Clark v. Wal-Mart,619 S.E.2d 491 (2005); Hilliard v, Apex Cabinet Co., 305 N.C. 593, 595,290 S.E.2d 682, 683 (1982).
5. Plaintiff failed to prove by the greater weight of the evidence that he has an ongoing disability related to his compensable injury beyond August 6, 2005 or that he diligently *Page 16 
sought employment. Johnson v. Southern Tire Sales and Service,358 N.C. 701, 709, 599 S.E.2d 508, 514 (2004).
6. Plaintiff is entitled to benefits for a permanent partial impairment rating of 15% to his back. N.C. Gen. Stat. § 97-31.
7. Defendants are entitled to a credit for unemployment benefits paid to plaintiff, as well as ongoing total disability paid to plaintiff after he was released and rated by Dr. Allen on August 6, 2005. N.C. Gen. Stat. § 97-42.1; Knight v. Wal-Mart Stores, Inc., 149 N.C. App. 1,562 S.E.2d 434, disc. review denied, 355 N.C. 749, 565 S.E.2d 667
(2002), aff'd per curiam, 357 N.C. 44, 577 S.E.2d 620 (2003).
8. Plaintiff is entitled to medical compensation for his treatment by Dr. McAvoy and Dr. Allen that is related to his compensable 2004 work related injury by accident and is reasonably required to effect a cure, provide relief, or lessen plaintiff's period of disability. Defendants are required to pay for plaintiff's second opinion with Dr. Martinez. As Dr. Baule's treatment of plaintiff was not related to plaintiff's 2004 workers' compensation injury, plaintiff is not entitled to medical compensation for the treatment he received by Dr. Baule. N.C. Gen. Stat. §§ 97-2(19); 97-25.
 ***********
Based upon the foregoing findings of fact and conclusions of law, the Full Commission enters the following:
 AWARD
1. Plaintiff's claim for ongoing total disability benefits is hereby DENIED.
2. Plaintiff is awarded disability benefits for a 15% permanent partial impairment rating to his back subject to the credits specified above in Conclusion of Law No. 7. *Page 17 
3. Defendants shall pay for plaintiff's medical treatment with Dr. Allen and Dr. McAvoy which was reasonably required to effect a cure, provide relief, or lessen plaintiff's period of disability. Defendants shall also pay for plaintiff's second opinion with Dr. Martinez.
4. Defendants shall pay the costs.
This the 18th day of August, 2008.
 S/_____________ BUCK LATTIMORE COMMISSIONER
CONCURRING:
 S/_____________ PAMELA T. YOUNG CHAIR
 S/_____________ BERNADINE S. BALLANCE COMMISSIONER *Page 1